IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHESAPEAKE BAY FOUNDATION, INC.,
 et al.,
     *Plaintiffs,*     *

            *

     v.      *   Civil No. JFM-10-1861

            *

SEVERSTAL SPARROWS POINT, LLC, *

et al.,

     *Defendants.*    *

            *

            *

          ******

## OPINION

Plaintiffs, Chesapeake Bay Foundation, Inc. and Baltimore Water Harbor Keeper, Inc., are Section 501(c)(3) non-profit corporations dedicated to the protection and restoration of the Chesapeake Bay watershed and its tributaries and of the Baltimore Harbor and greater Patapsco River, respectively. Plaintiffs Joseph Anderson, Arthur and Tina Cox, Rebecca Kolberg, Wilton Strong, and Connie and Jerry Tomko, are individuals who live, recreate, and enjoy the waters surrounding the Sparrows Point Facility ("the Site" or "the Facility"), south of Baltimore, Maryland. Collectively, these non-profit corporations and individuals (hereinafter "Plaintiffs") bring this action against Defendants, Severstal Sparrows Point LLC, a/k/a Severstal North America ("Severstal") and ArcelorMittal USA Inc. ("ArcelorMittal"), for violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*; the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.*; the Maryland Erosion and Sediment Control Regulations, COMAR 26.17.01.01, *et seq.*; and corresponding laws of Maryland relating to solid and hazardous waste management and water pollution control as set forth in the Environment Article of the Maryland Code. Plaintiffs seek declaratory and injunctive relief, penalties, and costs of litigation, including attorney fees and expert witness fees.

Now pending are ArcelorMittal and Severstal's Motions to Dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1), claiming a lack of subject matter jurisdiction, and Rule 12(b)(6), claiming that Plaintiffs have failed to state a claim against Defendants on which relief can be granted. For the following reasons, I grant ArcelorMittal and Severstal's Motions to Dismiss as to Counts I, III, IV, V, and VI, and I deny ArcelorMittal and Severstal's Motions to Dismiss as to Counts II and VII.

## I. Factual Background

The Sparrows Point Facility is located on approximately 2,300 acres of land in Sparrows Point, Maryland. (Compl. ¶ 45.) The waters adjacent to the Facility are tidal tributaries to the Chesapeake Bay. (*Id.*) The original owner of the Facility, Bethlehem Steel Corporation ("BSC"), owned the Site for 80 years, making iron and steel, as well as building and demolishing ships. (*Id.* ¶ 46.)

### A. Consent Decree

In the late 1990s, the Environmental Protection Agency ("EPA") and Maryland Department of the Environment ("MDE") brought an action against BSC for violations of RCRA, the CWA, and corresponding state law, which the parties settled by executing a Consent Decree, entered in this Court on October 8, 1997.[1] (Compl. ¶¶ 52-53.) This Consent Decree was subject to public notice and comment before becoming final. *See* 62 Fed. Reg. 11917 (Mar. 13, 1997). The RCRA corrective action provisions of the Consent Decree provided that BSC was required to conduct a site-wide investigation to define the extent of hazardous wastes and constituents in the groundwater system, as well as identify, characterize, and determine the

---

[1] *See Maryland v. Bethlehem Steel Corp.*, No. JFM-97-558 (D. Md. filed Feb. 25, 2007).

impact of the release of hazardous wastes and constituents to the air, groundwater, surface water, sediment, and soil throughout the Facility. (Severstal Mot. to Dismiss, Ex. 1 at 13-14.)

The Consent Decree also required BSC to implement "interim measures" and conduct a "corrective measures study." (*Id.*, Ex. 1 at 9, 14.) Interim measures are required when EPA or MDE determine that a release from the facility poses a threat to human health or the environment that requires more immediate action than that which would follow from the development and implementation of a final remedy. (Severstal Mem. 6.) The corrective measures study is used to develop and evaluate corrective action alternatives for removal, containment, treatment, and/or remediation of the contamination and to recommend the corrective measures to be taken at the Facility. (*Id.*)

The Consent Decree further imposes compliance requirements related to the two on-site landfills, Coke Point and Greys Landfills. (*See* Severstal Mot. to Dismiss, Ex. 1 at 30.) These requirements relate to the types of waste the landfills may accept, as well as inspection requirements to ensure that only acceptable wastes are disposed in the landfills. (*Id.*, Ex. 1 at 30-34.) Additionally, the Consent Decree establishes compliance measures for the operation of the landfills, such as monitoring requirements and erosion controls. (*Id.*, Ex. 1 at 34-41.) A closure plan and post-closure plan are also required for each landfill. (*Id.*, Ex. 1 at 41-44.)

### B. BSC Bankruptcy

Bethlehem Steel filed for Chapter 11 bankruptcy on October 15, 2001 in the Southern District of New York. (Severstal Mem. 7.) On March 12, 2003, BSC entered into an Asset Purchase Agreement ("APA") with ISG Acquisition, Inc., and International Steel Group (collectively "ISG") for ISG to purchase certain assets and assume certain liabilities from BSC, including the Sparrows Point Facility. (*See* Severstal Mot. to Dismiss, Ex. 6.) On April 23, 2003,

the Bankruptcy Court for the Southern District of New York entered a Bankruptcy Sale Order approving BSC's sale of the Facility pursuant to the terms of the APA. (*Id.*, Ex. 7.) The APA specifies the assumed and excluded liabilities and excludes liability for any environmental obligation relating to any property or asset other than the acquired assets; the Sparrows Point Facility is such an acquired asset. (*Id.*, Ex. 6) The Bankruptcy Order serves as confirmation, stating that ISG was not assuming successor liability except as provided in the APA. (*Id.*, Ex. 7.)

Mittal Steel merged with ISG on or about April 5, 2005, thus acquiring the Facility. (Compl. ¶ 11.) Mittal Steel then merged with Arcelor on or about June 26, 2006, creating ArcelorMittal. (*Id.* ¶ 10.) The parties' dispute over the precise ownership of the Facility throughout these corporate transformations is discussed below.

## II. Procedural Background

Prior to filing in federal court, Plaintiffs sent a Notice of Intent to Sue ("NOI") letter to Defendants on May 29, 2010, as mandated by the CWA's citizen suit provision, 33 U.S.C. § 1365(b) (requiring that sixty days prior to the initiation of a civil action against any alleged violator, a citizen give notice of its intent to sue to the EPA Administrator, the State in which the violations are alleged to have occurred, and the alleged violator); RCRA's citizen suit provision, 42 U.S.C. § 6972(b)(2)(A) (requiring notice to the same parties ninety days prior to the initiation of a civil action); and the Maryland Code of Natural Resources § 1-505(b) (requiring that 30 days prior to the commencement of the action, a plaintiff must deliver written notice to the agency of the State responsible for initiating official action and on the Attorney General). (*See* Compl. ¶ 6.) The NOI letter claimed that the "Potentially Responsible Parties" have demonstrated "an ongoing and consistent pattern . . . of failing to comply with the requirements of the Consent Decree, [the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA")], [the Clean Air Act ("CAA")], CWA, RCRA, and Maryland law at the Sparrows Point facility." (Severstal Mot. to Dismiss, Ex. 2)

Plaintiffs filed this action on July 9, 2010. Defendants filed Motions to Dismiss on September 19, 2010; Plaintiffs' opposition and Defendants' replies were filed in a timely manner. A motions hearing was held on March 11, 2011.

### III. Statutory Background

RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste. *See Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331-32 (1994). RCRA's primary purpose is to "reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated. . . ." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). Citizens are permitted to bring private suits under RCRA in certain circumstances, but the "chief responsibility for the implementation and enforcement of RCRA rests with the Administrator of the Environmental Protection Agency." *Id.* at 483-84 (citing 42 U.S.C. § 6902(b)). Section 3006 of RCRA, 42 U.S.C. § 6926, allows the states to develop hazardous waste programs at least as stringent as RCRA, subject to authorization by the Administrator of the EPA. After receiving authorization, the state may implement its hazardous waste program "in lieu of the Federal program." Section 3006(b) of RCRA, 42 U.S.C. § 6926(b). Maryland has received final authorization for its hazardous waste program. *See* 50 Fed. Reg. 3511 (Jan. 25, 1985) (as revised by 69 Fed. Reg. 44463 (July 26, 2004)).

Congress passed the CWA for the stated purpose of "restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "To serve those ends, the Act prohibits 'the discharge of any pollutant by any person' unless done in

compliance with some provision of the Act." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004) (quoting 33 U.S.C. § 1311(a)). One such provision, codified at 33 U.S.C. § 1342, "established a National Pollution Discharge Elimination System [NPDES] . . . that is designed to prevent harmful discharges into the Nation's waters." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007). "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *Miccosukee Tribe*, 541 U.S. at 102. "The Environmental Protection Agency [] initially administers the NPDES permitting system for each State, but a State may apply for a transfer of permitting authority to state officials. If authority is transferred, then state officials . . . have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight." *Nat'l Ass'n of Home Builders*, 551 U.S. at 650 (citations omitted). The State of Maryland is authorized to administer the NPDES program and does so through the MDE. *See Piney Run Pres. Ass'n v. Cnty. Comm'rs ("Piney Run I")*, 268 F.3d 255, 265 (4th Cir. 2001).

With regard to enforcement of the CWA, "[a]lthough the primary responsibility . . . rests with the state and federal governments, private citizens provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations." *Piney Run Pres. Ass'n v. Cnty. Comm'rs ("Piney Run II")*, 523 F.3d 453, 456 (4th Cir. 2008) (citing *Sierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 504 F.3d 634, 637 (6th Cir. 2007)). Specifically, Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes citizens "to bring suit against any NPDES permit holder who has allegedly violated its permit." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000) (en banc). This citizen suit provision is "critical" to the enforcement of the CWA, *see*

*id.*, as it allows citizens "to abate pollution when the government cannot or will not command compliance," *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987). Similar to the RCRA enforcement scheme, however, citizen suits are meant "to supplement rather than to supplant governmental action," *id.* at 60, and the CWA—specifically § 1365(b)(1)(B)—"bars a citizen from suing if the EPA or the State has already commenced, and is 'diligently prosecuting,' an enforcement action," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 175 (2000). This "statutory bar is an exception to the jurisdiction granted in subsection (a) of § 1365, and jurisdiction is normally determined as of the time of the filing of a complaint." *Chesapeake Bay Found. v. Am. Recovery Co.*, 769 F.2d 207, 208 (4th Cir. 1985).

As previously noted, RCRA, the CWA, and the Maryland Code of Natural Resources all contain notice and delay requirements. *See* CWA, 33 U.S.C. § 1365(b) (sixty days); RCRA, 42 U.S.C. § 6972 (b)(2)(A) (ninety days); Maryland Code of Natural Resources § 1-505(b) (thirty days). The Supreme Court has addressed statutory notice requirements in the context of a challenge under RCRA. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20 (1989). In holding that the plain language of the RCRA notice requirement created a mandatory condition precedent to the commencement of a citizen suit, the Court discussed the congressional goals met by the RCRA notice requirement: "the legislative history indicates an intent to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits." *Hallstrom*, 493 U.S. at 29 (citing 116 Cong. Rec. 32927 (1970) (comments of Sen. Muskie)). The Court observed further that statutory notice and delay provisions like the ones found in RCRA serve to provide an alleged violator the opportunity to attempt compliance with its permit restrictions, thereby avoiding litigation based

on the alleged violations. *Id.* The Fourth Circuit has recently applied the same rationale in holding that the CWA requires compliance with its notice and delay provisions. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 399 (4th Cir. 2011).

## IV. Standard of Review

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1), asserting that this Court lacks subject matter jurisdiction over Plaintiffs' RCRA and CWA claims for several reasons. (Severstal Mot. to Dismiss 1; ArcelorMittal Mot. to Dismiss 2.) In addition, Defendants claim that this Court lacks subject matter jurisdiction over Plaintiffs' Maryland state law claims because Maryland law does not authorize citizen suits for the alleged violations. (Severstal Mot. to Dismiss 2; ArcelorMittal Mot. to Dismiss 2.)

A plaintiff has the burden of proving that subject matter jurisdiction exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

Defendants also move to dismiss the Plaintiffs' action under Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Generally, when ruling on a

12(b)(6) motion, the court assumes that the facts alleged in the complaint are true and draws all reasonable factual inferences in the nonmoving party's favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). A complaint need not provide "detailed factual allegations," but it must "provide the grounds of [the plaintiff's] entitlement to relief" with "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal quotations omitted).

## V. Admissibility of Exhibits

As an initial matter, the parties dispute the extent to which I may consider exhibits outside the pleadings in deciding the Motions to Dismiss without converting them to Rule 56 motions for summary judgment. Defendant Severstal's Motion includes forty-two exhibits and ArcelorMittal's Motion includes four exhibits.[2] Defendants claim that I may consider all the exhibits in evaluating their Motions to Dismiss, without converting the Motions to Rule 56 motions for summary judgment, because all the exhibits are authentic and are either public records or integral to the claims asserted in the Complaint. (Severstal Mem. 15.) Plaintiffs assert, however, that only six of Severstal's exhibits and one of ArcelorMittal's exhibits meet these criteria. (Pls.' Opp'n 8.)

In order to resolve this dispute, an important distinction must be drawn between the evidence a court may consider in reviewing a Rule 12(b)(1) motion to dismiss, as opposed to a Rule 12(b)(6) motion to dismiss. Where a motion to dismiss under Rule 12(b)(1) presents a factual challenge to the court's jurisdiction, a court need not assume that all facts alleged in the

---

[2] In addition, ArcelorMittal's Motion to Dismiss incorporates the exhibits attached to Severstal's Motion to Dismiss by reference. (*See, e.g.*, ArcelorMittal Mem. 4 n.5.)

complaint are true.[3] *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) ("In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004) ("[O]nce a factual attack is made on the federal court's subject matter jurisdiction, the district judge is not obliged to accept the plaintiff's allegations as true . . . ."). Moreover, a court may consider matters outside the pleadings in deciding whether it has jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) ("When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the district court . . . may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.") (internal citation omitted).

In contrast, in ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court may not consider extrinsic evidence at the 12(b)(6) stage, generally. Where, however, "a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare*

---

[3] The challenge presented to this Court is factual. With respect to a Rule 12(b)(1) *facial* challenge, however, a court must accept all factual allegations in the complaint as true and may consider only the complaint and the documents on which it is based. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

*Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (citing *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). An integral document is a document that by its "very existence, and *not the mere information it contains*, gives rise to the legal rights asserted." *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) (emphasis added).[4] In addition to integral and authentic exhibits, on a 12(b)(6) motion the court "may properly take judicial notice of matters of public record." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

In the instant case, Defendants move this Court to dismiss all seven Counts of the Complaint pursuant to Rule 12(b)(1).[5] (Severstal Mot. to Dismiss 1-2.) Accordingly, in deciding whether subject matter jurisdiction exists, I need not attach presumptive truthfulness to the facts alleged in the Complaint and may consider all the attached exhibits without converting the motions to motions for summary judgment. In the alternative, Defendants move this Court to dismiss Counts III–VII of the Complaint under 12(b)(6). (Severstal Mot. to Dismiss 1-2; ArcelorMittal Mot. to Dismiss 2-3.) To the extent I find that subject matter jurisdiction exists over Counts III-VII, the Court's consideration of the 12(b)(6) motion will be limited to the pleadings and exhibits that are both integral and authentic, or matters of public record.

---

[4] As examples, "courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute." *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, 2010 U.S. Dist. LEXIS 68772, at *7 (D. Md. July 8, 2010) (internal quotation and citations omitted).

[5] Severstal asserts that this Court lacks subjects matter jurisdiction over Counts I, II, IV, and VI because CWA and RCRA bar citizen suits when the government is engaged in diligent prosecution of the Consent Decree, and because the CWA claims were not properly noticed in the Plaintiffs' NOI letter. (Severstal Mot. to Dismiss 1.) Severstal asserts that this Court lacks subject matter jurisdiction over Counts III, V, and VII because Maryland law does not authorize citizen suits for the alleged violations. (*Id.* at 2.) ArcelorMittal makes the same assertion, incorporating by reference Severstal's Motion to Dismiss. (ArcelorMittal Mot. to Dismiss 2-3.)

Defendants move this Court to dismiss the claims against it based on: (1) lack of subject matter jurisdiction over the citizen suits brought under RCRA (Counts I and II), and over the CWA claims (Counts IV and VI) because of diligent prosecution and improper notice; and (2) lack of subject matter jurisdiction over Plaintiffs' Maryland state law claims (Counts III, V, and VII) because Maryland law does not authorize citizen suits for the alleged violations. Each contention is discussed in turn.

### A. Subject Matter Jurisdiction over Plaintiffs' RCRA and CWA claims

Defendants claim that the RCRA claims are barred by the government's diligent prosecution of an existing Consent Decree and, as such, this Court lacks subject matter jurisdiction over Counts I and II. Additionally, Defendants claim that the CWA claims asserted in Counts IV and VI are either not authorized in a citizen suit, or are impermissible because they were not properly noticed in the Plaintiffs' NOI letter.

1. *Plaintiffs' RCRA Claims (Counts I and II)*

As discussed above, both the RCRA and the CWA contain citizen suit provisions, *see* RCRA, 42 U.S.C. § 6972; CWA, 33 U.S.C. § 1365, permitting such suits under certain circumstances only. Severstal asserts that the RCRA citizen suit provision does not permit Plaintiffs' claims to go forward.

In Count I of the Complaint, Plaintiffs allege that, based on the hazardous wastes that have been found in Bear Creek and the Patapsco River, Defendants have and continue to release

---

[6]ArcelorMittal has also moved to dismiss the claims against it on the independent ground that ArcelorMittal never owned or operated the Sparrows Point Facility (ArcelorMittal Mem. 7-12). That argument ultimately may prove to be well founded. However, in light of ArcelorMittal's acknowledgements that it "formerly held an interest in Defendant Severstal Sparrows Point LLC" (ArcelorMittal Mem. 10) and that "a former subsidiary owned the Facility" (ArcelorMittal Reply 9), I will permit discovery to proceed on this issue. ArcelorMittal may, of course, renew its argument by way of a motion for summary judgment at a later stage of these proceedings.

hazardous wastes into the environment that may imminently and substantially endanger human health and the environment in violation of RCRA, 42 U.S.C. § 6973. (Compl. ¶¶ 81-83.) Plaintiffs bring this claim under the RCRA citizen suit provision, 42 U.S.C. § 6972(a)(1)(B), which authorizes any person to commence a civil action,

> (B) against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste *which may present an imminent and substantial endangerment to health or the environment*;

42 U.S.C. § 6972(a)(1)(B) (emphasis added).

In Count II of the Complaint, Plaintiffs allege that Defendants have generated, stored, and disposed of hazardous wastes at the Site without a permit, and Defendant Severstal continues to do so in violation of RCRA, 42 U.S.C. § 6925. (Compl. ¶¶ 85-86.) Plaintiffs further allege that Defendants have not maintained the appropriate records regarding disposal of hazardous waste in the on-site landfills, and that Defendants do not have a permit to dispose of the waste in those landfills, in violation of RCRA, 42 U.S.C. § 6925. (*Id.* ¶¶ 87-91.) Plaintiffs bring this claim under the RCRA citizen suit provision, 42 U.S.C. § 6972(a)(1)(A), which provides that any person may commence a civil action,

> (A) against any person . . . who is alleged to be *in violation of any permit, standard, regulation, condition, requirement, prohibition, or order* which has become effective pursuant to this Act;

42 U.S.C. § 6972(a)(1)(A) (emphasis added).

Citizen suits under RCRA are permitted under certain circumstances only. Regarding citizen suits that are prohibited, Section 7002 of RCRA provides, in relevant part,

> (b) Actions prohibited.
> (1) No action may be commenced under subsection (a)(1)(A) of this section . . .

> (B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order.

> . . . .

> (2) (C) No action may be commenced under subsection (a)(1)(B) of this section if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment--

> > (i) has commenced and is diligently prosecuting an action under subsection (a)(1)(B);

42 U.S.C. § 6972(b). Accordingly, a citizen suit under either 42 U.S.C. § 6972(a)(1)(A) or (a)(1)(B) may be barred if a state or federal agency is diligently prosecuting an enforcement action against the same alleged violator, although the preclusion provisions for suits brought under (a)(1)(A) differ slightly from those applicable to (a)(1)(B) suits.

Importantly, where a government agency is prosecuting an alleged violation of the CWA or RCRA,[7] "diligence is presumed." *See Piney Run II*, 523 F.3d 453, 459 (4th Cir. 2008); *Cmty. of Cambridge Envtl. Health & Dev. Grp. v. City of Cambridge*, 115 F. Supp. 2d 550, 554 (D. Md. 2000) ("Most courts considering the diligence of a state or federal prosecution have exhibited substantial deference for the agency's process."); *see also Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007) ("Citizen-plaintiffs must meet a high standard to demonstrate that [a

---

[7] RCRA and the CWA contain the same "diligent prosecution" bar to citizen suits, and courts have found it appropriate to interpret the language in both statutes in the same manner. *See Ailor v. City of Maynardsville*, 368 F.3d 587, 601 (6th Cir. 2004) (finding that RCRA citizen suits can be brought "in substantially the same capacity as provided for in the CWA"); *Cox v. City of Dallas*, 256 F.3d 281, 308 (5th Cir. 2001) ("We are persuaded that the similarity of the citizen suit provisions of the CWA and the RCRA requires like interpretation."); *Supporters to Oppose Pollution v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992) (citing to a CWA citizen suit to determine the standard for diligent prosecution in a RCRA citizen suit).

government agency] has failed to prosecute a violation diligently.").[8] The Fourth Circuit has held

that a prosecution is "diligent" where the action "is capable of requiring compliance with the Act

and is in good faith calculated to do so." *Piney Run II*, 523 F.3d at 459. Additionally, the CWA

citizen suit provision "'does not require government prosecution to be far-reaching or zealous. It

requires only diligence.' Thus, a citizen-plaintiff cannot overcome the presumption of diligence

merely by showing that the agency's prosecution strategy is less aggressive than he would like or

that it did not produce a completely satisfactory result." *Id.* (citing *Karr*, 475 F.3d at 1197).

Regarding consent decrees and their implementation, administrative decisions are given

deference because a court "must be particularly deferential to the agency's expertise" and should

not interpret the scope of the "diligent prosecution" bar "in a manner that would undermine the

[government agency's] ability to reach voluntary settlements with defendants." *Id.* (internal

quotation omitted). Courts have found that consent decrees and their enforcement amount to

diligent prosecution. *See, e.g.*, *id.* at 460; *Cmty. of Cambridge*, 115 F. Supp. 2d at 556.[9]

---

[8] *But see* Jeffrey G. Miller, *Theme and Variations in Statutory Preclusions Against Successive Environmental Enforcement Actions by EPA and Citizens: Part One: Statutory Bars in Citizen Suit Provisions*, 28 Harv. Envtl. L. Rev. 401, 466 (2004) ("While some degree of deference is due to prosecutorial decisions, blind deference ignores the fact that Congress authorized citizen suits precisely because government enforcers were not always diligent and Congress intended courts to hear citizen suits where government enforcement was not 'adequately' prosecuted to require compliance. As one court observed, 'complete deference to agency enforcement strategy, adopted and implemented internally and beyond public control, requires a degree of faith in bureaucratic energy and effectiveness that would be alien to common experience.'") (citing *Gardeski v. Colonial Sand & Stone Co.*, 501 F. Supp. 1159, 1168 (S.D.N.Y. 1980)).

[9] *See id.* at 462 (explaining that most courts in considering a negotiated consent decree requiring compliance in accordance with a schedule have held that the action is still pending, and citizen suits are barred if the prosecutor is diligently monitoring compliance with the order and seeking to enforce it when the defendant fails to comply with the order's mandates).

Defendants argue that EPA and MDE are diligently prosecuting the RCRA claims under Counts I and II, and accordingly, this Court lacks jurisdiction over Plaintiffs' RCRA claims. (Severstal Mem. 18.) Defendants claim that the 1997 Consent Decree entered into by EPA, MDE, and BSC, and the litigation leading to the Consent Decree, encompass Plaintiffs' RCRA claims. (*Id.* at 18-19.) Defendants emphasize that the Consent Decree "embodies EPA's and MDE's continuing active enforcement with respect to environmental contamination, hazardous substance releases and continuing RCRA regulatory compliance at the Sparrows Pont [sic] Facility." (Severstal Reply Mem. 7.) Plaintiffs respond that their RCRA claims are not covered by the 1997 Consent Decree and therefore are not barred by diligent prosecution on the part of EPA and MDE. (Pls.' Opp'n 15.) Plaintiffs argue that the Consent Decree "has neither the intent nor the effect of addressing violations and environmental releases by the Defendants occurring 13 years following the entry of that decree." (*Id.* at 16.)

The key inquiry thus becomes whether the EPA and MDE's claims that led to the 1997 Consent Decree, and the Consent Decree itself, address Plaintiffs' RCRA claims. To the extent that they do, and that the Consent Decree is being implemented to resolve these claims, Plaintiffs' citizen suit is barred. Again, Plaintiffs allege in Count I that Defendants have and continue to release hazardous wastes into the environment that may imminently and substantially endanger human health and the environment in violation of RCRA, 42 U.S.C. § 6973. (Compl. ¶¶ 81-83.) In 1997, when MDE and EPA filed complaints against BSC, MDE's complaint made an almost identical allegation: that BSC was violating RCRA through "an imminent and substantial endangerment to the public health or welfare or the environment from the release or the substantial threat of release of hazardous wastes, and hazardous substances into the

environment . . . ."[10] (Severstal Mot. to Dismiss, Ex. 4 at 1.) The MDE thus "commenced" a civil "action" within the meaning of RCRA, "in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment." 42 U.S.C. § 6972(b).

These complaints were ultimately resolved by the Consent Decree, entered by this Court in 1997. Section V of the Consent Decree requires the implementation of corrective measures, including interim measures, in order to address releases at or from Sparrows Point Facility that pose a threat to human health or the environment. (Severstal Mot. to Dismiss, Ex. 1 at 8-15.) More specifically, Section V.B. mandates a site-wide investigation of environmental conditions at the Facility. (Severstal Mot. to Dismiss, Ex. 1 at 13-14 & Attach. B.) The "Conceptual Plan for the Site Wide Investigation," incorporated by reference into the Consent Decree, states the purpose and approach of the SWI: "[t]he SWI shall be a comprehensive evaluation of the potential for both current and future risk to human health and the environment from current and past releases of hazardous wastes and hazardous constituents at the Facility." (Severstal Mot. to Dismiss, Ex. 1, Attach. B.)

Plaintiffs concede that the "MDE complaint did allege releases from the Sparrows Point facilities causing an imminent and substantial endangerment at that time," but claim that "it is not at all clear to what extent those allegations were addressed in the 1997 Consent Decree." (Pls.' Opp'n 17). In the next sentence, however, Plaintiffs admit one of the ways in which the Consent Decree addressed those allegations, stating "[w]hile the Consent Decree addresses off-site investigation and corrective action, if necessary, [], Defendants do not agree that they must perform those tasks." (*Id.*) Plaintiffs thus appear to disagree with the resolution reached by MDE

---

[10] Consistent with the discussion above, in deciding a 12(b)(1) motion, this Court may consider exhibits outside the pleadings.

and BSC embodied in the Consent Decree and with Defendant's view of its implementation.[11]

Disagreement with a decision and its implementation does not amount to lack of diligent prosecution, however. There is no lack of diligent prosecution "[m]erely because the State may not be taking the precise action [the citizen plaintiff] wants it to or moving with the alacrity [the citizen plaintiff] desires." *N. & S. Rivers Watershed Ass'n v. Town of Scituate*, 949 F.2d 552, 558 (1st Cir. 1991). Moreover, "an unsatisfactory result does not necessarily imply lack of diligence." *Karr v. Hefner*, 475 F.3d 1192, 1197 (10th Cir. 2007). Plaintiffs' disagreement with the MDE over the resolution it reached with BSC regarding its imminent and substantial endangerment claim does not overcome Defendants' position that Count I is barred by diligent prosecution.

In addition, Plaintiffs state that it is "unclear whether the governments believe that the Consent Decree requires [off-site] investigation." (Pls.' Opp'n 17.) Yet, the issue of whether the Consent Decree mandates that Severstal must investigate off-site contamination is the subject of the dispute resolution petition filed by Severstal against EPA and MDE in this Court on August 3, 2010. *See Severstal Sparrows Point, LLC v. U.S. Envtl. Prot. Agency*, No. JFM-97-558 (D. Md. July 5, 2011). This petition is evidence that EPA and MDE are "diligently prosecuting an

---

[11] Curiously, Plaintiffs argue that the Consent Decree does not amount to diligent prosecution as it has "neither the intent nor the effect of addressing violations and environmental releases by the Defendants occurring 13 years following the entry of that decree." (Pls.' Opp'n 16.) Plaintiffs claim that no consent decree addresses the violations that occurred after the bankruptcy sale order that took place on April 23, 2003. (*Id.* at 18.) The Consent Decree's language demonstrates unmistakably, however, that its mandates did not apply to a frozen moment in 1997 only, but rather, apply on an ongoing basis. This continuous obligation is made clear throughout the Consent Decree, for example, by Section V.A., which requires BSC to submit an annual report providing information on remedial activities and an operation and monitoring work plan for the next calendar year. (Severstal Mot. to Dismiss, Ex. 1 at 10.) Moreover, Severstal admits that it has responsibility under the Consent Decree for on-site contamination and for any current releases of contamination from the Facility. (Severstal Reply Mem. 8.) It is clear that the Consent Decree remains in effect and thus, to the extent that it covers Plaintiffs claims and is being implemented, Plaintiffs' citizen suit is barred.

action under subsection (a)(1)(B)." 42 U.S.C. § 6972(b)(2)(C)(i). Accordingly, I grant Defendants' Motions to Dismiss Count I because Plaintiffs' citizen suit is precluded by EPA and MDE's diligent prosecution of the same claim. 42 U.S.C. § 6972(b)(2)(C)(i).

Plaintiffs allege in Count II that Defendants have and continue to operate waste treatment, storage and disposal facilities on site without a permit in violation of RCRA Section 3005, 42 U.S.C. § 6925, and applicable implementing regulations, 40 C.F.R. Parts 262, 264, and 265. (Compl. ¶ 85-93.) More specifically, Plaintiffs allege that Defendants improperly disposed and continue to dispose hazardous waste in the on-site landfills and the Patapsco River and Bear Creek without RCRA permits. (*Id.* ¶¶ 87-93.) According to Plaintiffs, a RCRA permit "prescribes comprehensive waste management and financial assurance standards governing the operation of the facility," and Defendants did not and do not have such a permit. (Pls.' Opp'n 18-19.) Again, RCRA's citizen provision provides that "any person may commence a civil action . . . against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this Act," 42 U.S.C. § 6972(a)(1)(A), unless "the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order." 42 U.S.C. § 6972(b)(1)(B). Plaintiffs claim that neither of the complaints filed by EPA and MDE in 1997 allege violations of the RCRA permit requirement for operation or closure of the hazardous waste facilities, nor does the Consent Decree require BSC to obtain a RCRA permit. (Pls.' Opp'n 19.)

Defendants do not claim to have or to have had a RCRA permit, but they do claim that Plaintiffs' Count II is barred by the Consent Decree. (Severstal Mem. 19.) Defendants maintain

that to the extent that Count II alleges that releases from the Facility are posing threats to human health or the environment, (*see* Compl. ¶¶ 92-93), these claims are precluded in the same manner as the claims contained within Count I. (Severstal Mem. 19.) Defendants claim that the remaining allegations in Count II, relating to the RCRA permitting requirement, are barred by diligent prosecution because MDE's 1997 complaint contained a specific count addressing the two on-site landfills. (Severstal Reply 12; *see also* Severstal Mot. to Dismiss, Ex. 4 at 7.) In addition, "Section VII.C of the Consent Decree contains detailed compliance requirements for Greys and Coke Point Landfills and thus, encompasses CBF's allegations in Paragraphs 85 thru 91 in Count II of the Complaint." (Severstal Reply 12.)

Consistent with the discussion concerning Count I above, Defendants are correct that the claims contained in paragraphs 92-93 of Count II, alleging that releases from the Facility are posing threats to human health or the environment, are barred by diligent prosecution. The remaining claims in Count II concerning the RCRA permit, ¶¶ 85-91 of the Complaint, pose a closer question, however.

MDE's 1997 complaint states in Count III that "BSC has and at relevant times had 'interim status' under Section 3005(e) of RCRA, 42 U.S.C. § 6925(e) of the Federal hazardous waste program, under which BSC is treated as having been issued a Federal permit for certain designated activities and BSC must comply with interim status standards set forth at 40 C.F.R. part 265 and 266." (Severstal Mot. to Dismiss, Ex. 4 at ¶ 18.) The next Count of MDE's complaint, Count IV, alleges "Failure to Competently and Efficiently Operate Landfills." (*Id.*, Ex. 4 at 7.) Presumably in response to these allegations by MDE, Section VII.C of the Consent Decree sets out "Compliance Requirements for Coke Point and Greys Landfill Operations," and includes a plan "for future uses and eventual closure of each solid waste acceptance facility."

(*Id.*, Ex. 1 at 30-44.) Plaintiffs claim this is not equivalent to a RCRA permit that complies with the relevant hazardous waste management regulations detailed in 40 C.F.R. Part 264, however. (Pls.' Opp'n 22.) Accordingly, Plaintiffs assert that their RCRA permit claim is not covered by the Consent Decree and thus is not subject to the diligent prosecution bar.

Unlike the claims in Count I, which were almost identical to those in MDE's 1997 complaint, were addressed by the Consent Decree, and are now the subject of a dispute resolution petition, the RCRA permitting claims in Count II are not clearly precluded by diligent prosecution under 42 U.S.C. § 6972(b)(1)(B). While MDE's 1997 complaint alleges violations of the Facility's interim status under RCRA Section 3005(e), 42 U.S.C. § 6925(e), and thus alleges a violation of RCRA's permitting requirement (Severstal Mot. to Dismiss, Ex. 4 at ¶¶ 18-21), the Consent Decree does not appear responsive to these claims. The Consent Decree lists requirements for the two on-site landfills at Sparrows Point, but it does not require the owner and operator of the Facility to obtain a RCRA permit. (*See* Severstal Mot. to Dismiss, Ex. 1 at 30-44.) Accordingly, Plaintiffs may pursue their RCRA permitting claims against Defendants pursuant to 42 U.S.C. § 6972(a)(1)(A), because there is insufficient evidence that "the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit . . ." 42 U.S.C. § 6972(b)(1)(B). I therefore deny Defendants' Motions to Dismiss as to the RCRA permitting claims in Count II.[12]

---

[12] In the alternative, Defendants argue that this Court should "abstain from considering [Counts I and II] based on the doctrine of primary jurisdiction due to EPA and MDE's expertise and continuing jurisdiction over remediation matters at the Sparrows Point Facility." (Severstal Mem. 25.) The doctrine of primary jurisdiction "is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling."

## 2. *Plaintiffs' CWA Claims (Counts IV and VI)*

In Count IV, Plaintiffs allege that Defendants are discharging hazardous substances, as designated by 40 C.F.R. § 116.4, into the nation's waters or adjacent shorelines in amounts exceeding reportable quantity standards in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b). (Compl. ¶¶ 97-102.) In addition, Plaintiffs allege that Defendants have violated Sections 301(a) and 402(a) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(a), by discharging pollutants into navigable waters without a permit. (*Id.* ¶¶ 103.) Plaintiffs bring these claims as citizen-plaintiffs under the CWA's citizen suit provision, 33 U.S.C. § 1365, which provides that any citizen may commence a civil action "against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). For purposes of this citizen suit provision, § 1365(f) defined "effluent standard or limitation" as:

1. an unlawful act under subsection (a) of section 301 of this Act [33 U.S.C. § 1311(a)];
2. an effluent limitation or other limitation under section 301 or 302 of this Act [33 U.S.C. § 1311 or 1312];
3. standard of performance under section 306 of this Act [33 U.S.C. § 1316];

---

*Reiter v. Cooper*, 507 U.S. 258, 268 (1993). The doctrine has been deemed to apply in circumstances in which federal litigation raises a difficult, technical question that falls within the expertise of a particular agency. *See, e.g.*, *Am. Auto. Mfrs. Ass'n. v. Mass. Dept. of Envtl. Prot.*, 163 F.3d 74, 81 (1st Cir. 1998).

Plaintiffs argue that this Court should not apply the doctrine because RCRA and CWA citizen suits are "well within the competence of federal district courts to resolve," (Pls.' Opp'n 29) and this case does not involve "related collateral proceedings before an agency other than the court which would [be] disrupted by allowing the citizen suit to proceed" (*id.* at 30). Plaintiffs also cite to several RCRA or CWA cases in which the court has declined to invoke the doctrine of primary jurisdiction based on congressional direction as to when federal district courts should entertain such suits. (*Id.* at 29 & n.21.) *See, e.g.*, *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) (declining to apply the doctrine of "primary jurisdiction" to a RCRA citizen suit because "[t]hat would be an end run around RCRA. Congress has *specified* the conditions under which the pendency of other proceedings bars suit under RCRA," and where "those conditions have not been satisfied," the district court should hear the case). I find Plaintiffs' arguments persuasive, and I will not abstain from considering Plaintiffs' surviving RCRA claim.

4.  prohibition, effluent standard or pretreatment standards under section 307 of this Act [33 U.S.C. § 1317];
5.  certification under section 401 of this Act [33 U.S.C. § 1341];
6.  a permit or condition thereof issued under section 402 of this Act [33 U.S.C. § 1342], which is in effect under this Act [33 U.S.C. §§ 1251 et seq.] (including a requirement applicable by reason of section 313 of this Act [33 U.S.C. § 1323]); or
7.  a regulation under section 405(d) of this Act [33 U.S.C. § 1345(d)].

33 U.S.C. § 1365(f).

Defendants move this Court to dismiss Count IV on the basis that claims brought pursuant to 33 U.S.C. § 1321 are not authorized under the CWA citizen suit provision. (Severstal Mem. 27.) Defendants claim that while the citizen suit provision allows any person to bring a claim for an alleged violation of an effluent standard or limitation, or of an order with respect to such standard or limitation, *see* 33 U.S.C. § 1365(a), the definition of "effluent standard or limitation" in 33 U.S.C. 1365(f) does not include § 1321. (*Id.* at 28.) Accordingly, under the plain language of the CWA citizen suit provision, a citizen-plaintiff is not authorized to bring a claim for a violation of § 1321. (*Id.*) Defendants argue that only the government, not citizens, can issue fines and penalties under § 1321 for oil and hazardous waste spills. (*Id.* at  27.)

Plaintiffs argue that because one of the CWA sections that is subject to citizen suits, § 1311(a), does not exclude § 1321 from citizen enforcement, a citizen suit must be permitted for violations of § 1321. (Pls.' Opp'n 35.) However, Plaintiffs' argument ignores the basic tenet of statutory construction that the express inclusion of one item in a statute implies the exclusion of another, *see Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 110-11 (4th Cir. 2006); 2A Norman J. Singer, Sutherland on Statutory Construction § 47.23 (6th ed. 2000). That is, if Congress intended to allow citizen suits for the enforcement of § 1321, Congress would have included § 1321 in the citizen suit provision's definition of "effluent standard or limitation" just

as it included other sections of the CWA.[13] Defendants' view, that claims brought pursuant to 33 U.S.C. § 1321 are not authorized under the CWA citizen suit provision, is thus persuasive.

Count IV is not limited to claims under § 1321 only, however. Plaintiffs also allege that Defendants have violated 33 U.S.C. §§ 1311(a) and 1342(a) by discharging pollutants into the navigable waters without a permit. (Compl. ¶ 103.) Both § 1311 and § 1342 are included in the CWA citizen suit definition of "effluent standard or limitation." *See* 33 U.S.C. § 1365(f). Accordingly, alleged violations of § 1311 and § 1342 are proper subjects of citizen enforcement through 33 U.S.C. § 1365(a). Defendants argue, however, that this Court should dismiss this claim as well because a permit cannot be required under the CWA for a nonpoint source discharge and Plaintiffs' allegations relate to nonpoint source discharges. (Severstal Mem. 30-32.)

Defendants appear to be correct. Section 1311 provides that in the absence of a permit, except under specified circumstances, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). Importantly, though, "discharge of a pollutant" is defined by the CWA as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Plaintiffs allege that hazardous substances have contaminated the soil and groundwater at the Facility and that these hazardous substances are being released in Bear Creek and the Patapsco River. (*See* Compl. ¶¶

---

[13] Additionally, it makes little sense to use § 1311(a) as a means to include § 1321 in the citizen suit provision of the CWA. The effect of § 1311(a) is that it is illegal to discharge a pollutant without first obtaining a permit. Section 1321 deals with oil and hazardous waste spills for which it is impossible to obtain an authorization permit. *See* 33 U.S.C. § 1321(b)(1).

47-51, 65-66, 99-100.) Discharge from migrations of groundwater or soil runoff is not point source pollution, however, but nonpoint source pollution. *See Sierra Club v. El Paso Gold Mines*, 412 F.3d 1133, 1141 n.4 (10th Cir. 2005); *Friends of Santa Fe Cnty. v. LAC Minerals*, 892 F. Supp. 1333, 1359 (D.N.M. 1995). The Complaint thus alleges nonpoint source discharges, not point source discharges. There is no basis for a citizen suit for nonpoint source discharges under the CWA. Accordingly, I dismiss Count IV.[14]

---

[14] Defendants argue further that this Court should dismiss this claim because Plaintiffs did not include allegations that Defendants were discharging pollutants into navigable waters without a permit in violation of §§ 1311 and 1342 in their NOI letter. (Severstal Mem. 30.) Plaintiffs, however, state that notice "was sufficient to inform Defendants of the nature of Plaintiffs' claims." (Pls.' Opp'n 38.) The Fourth Circuit has held that the CWA mandates compliance with its notice and delay provisions, and that a party filing suit under the CWA must comply with the regulation implementing the CWA's notice requirement, 40 C.F.R. § 135.3(a). *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 399 (4th Cir. 2011). This regulation provides, in relevant part, that the notice "shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated," as well as the "the activity alleged to constitute a violation." 40 C.F.R. § 135.3(a).

Plaintiffs' NOI letter makes no reference to a violation of the CWA's permitting requirement under 33 U.S.C. §§ 1311 and 1342. (*See* Severstal Mot. to Dismiss, Ex. 2.) In stating that their letter was sufficient to give notice, Plaintiffs cite to a portion of the letter in which they allege that "surface water contamination is leaving the site from Coke Point Landfill and entering the Patapsco River. . . . [i]n addition to violating the terms of the Consent Decree, the failure to properly control the discharge and release of hazardous materials into the surrounding environment is a violation of federal and state law." (Pls.' Opp'n 37; Severstal Mot. to Dismiss, Ex. 2 at 16.) This allegation can hardly be said to "include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated" as required by 40 C.F.R. § 135.3(a). This portion of the letter makes no reference to a permit generally, let alone the permitting requirement under 33 U.S.C. §§ 1311 and 1342. Plaintiffs also cite to the portion of the letter in which they allege violations of 33 U.S.C. § 1321, which prohibits the discharge of hazardous substances into the nation's waters or adjoining shorelines. (Pls.' Opp'n 37; Severstal Mot. to Dismiss, Ex. 2 at 19.) Allegations that Defendants violated § 1321 are not equivalent to allegations that Defendants violated §§ 1311 and 1342, however.

Accordingly, Plaintiffs' NOI letter does not provide sufficient notice of an alleged violation of the CWA's permitting requirement under 33 U.S.C. §§ 1311 and 1342. This is an additional reason for dismissal. *See Friends of the Earth, Inc.*, 629 F.3d at 400-01 (holding that where alleged discharge violations were not specifically identified in the plaintiff's notice letter, notice was inadequate and required reversal of the district court's finding that defendant had committed the violation); *cf. Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997) (holding notice sufficient under the CWA where letter asserted violation

In Count VI, Plaintiffs allege that Defendants have violated and continue to violate the National Pollution Discharge Elimination System (NPDES) permit that has been issued to the Sparrows Point Facility. (*See* Compl. ¶¶ 108-113.) Plaintiffs list specific violations by both discharge point and quarter (*id.* ¶¶ 111-112), which Plaintiffs claim are "[b]ased on EPA Environmental Compliance History Online database inquiries, investigation of NPDES Discharge Monitoring Reports, and review of published federal and state data" (*id.* ¶ 110). Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, industrial facilities that discharge pollutants into the waters of the United States from a point source are required to obtain a NPDES permit. NPDES permits establish discharge limits on specific pollutants at specific monitoring or discharge points (called "outfalls" or "point sources"), as well as sampling, recordkeeping, and reporting requirements for each outfall. (Severstal Mem. 33.) The frequency of sampling varies by pollutant and outfall. (*Id.*) Severstal Sparrows' NPDES permit authorizes discharges through twenty-two different monitoring points and outfalls, and contains nine tables of monitoring requirements for specified monitoring points and outfalls. (*Id.*; *see also* Severstal Mot. to Dismiss, Ex. 30.) The MDE issued an NPDES permit to BSC in 1976 and a revised permit in March 2001. (Pls.' Opp'n 39.) The 2001 NPDES permit remains in effect as the MDE has yet to issue a renewed permit in response to Severstal's application. (*Id.* at 39 & n.27.) Severstal is required to submit its monitoring results to the MDE and EPA on a monthly basis. (Severstal Mem. 34.) Severstal does so through a form called a Discharge Monitoring Report ("DMR").

---

of a specific permit requirement, but incorrectly specified the particular source point of non-compliance because defendant had re-routed the stream of contaminated water to another point source). Therefore, even were I to find that the Complaint adequately alleges point source discharges, I would grant Defendants' Motions to Dismiss Count IV based on insufficient notice.

Defendants move this Court to dismiss Count VI because they assert that Plaintiffs failed to provide adequate notice of these claims in their NOI letter. (*Id.* at 33.) The Fourth Circuit recently considered the issue of sufficiency of notice in a CWA suit. *See Friends of the Earth, Inc.*, 629 F.3d 387. In that case, the court held that just as RCRA mandates compliance with its notice and delay provisions, so too does the CWA. *See id.* at 399. The Fourth Circuit further concluded that compliance with the regulation implementing the CWA's notice requirement, 40 C.F.R. § 135.3(a), is a mandatory condition precedent to filing suit under the CWA. *Id.* This regulation provides, in relevant part, that the notice "shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated," "the location of the alleged violation," as well as the "the activity alleged to constitute a violation." 40 C.F.R. § 135.3(a). "Notice given by a citizen plaintiff under the Clean Water Act thus must provide the alleged violator with enough information to attempt to correct the violation and avert the citizen suit." *Friends of the Earth, Inc.*, 629 F.3d at 400.

Plaintiffs' May 29, 2008 NOI letter provides that the location where the alleged violations of the NPDES permit occurred is "Sparrows Point." (Severstal Mot. to Dismiss, Ex. 2 at 19.) Plaintiffs claim that this is sufficient notice of location under 40 C.F.R. § 135.3(a). In support of this claim, Plaintiffs cite to *Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433 (D. Md. 2010), in which the court found that identifying the farm where the alleged violations were occurring as "Hudson Farm" was sufficient identification of "the location of the alleged violation" under the notice requirements in 40 C.F.R. § 135.3(a). *Assateague Coastkeeper*, 727 F. Supp. 2d at 439. Plaintiffs reason that just as naming "Hudson Farm" was sufficient in *Assateague Coastkeeper*, naming "Sparrows Point" in the NOI letter is sufficient notice of location in the instant case.

Plaintiffs miss a key factual distinction between "Hudson Farm" and "Sparrows Point," however. Hudson Farm was a "concentrated animal feeding operation" ("CAFO") and CAFOs are included in the definition of "point source" under 33 U.S.C. § 1362(14). That is, by naming "Hudson Farm" as the location of the alleged violation in the notice letter, the plaintiffs in *Assateague Coastkeeper* identified a single "point source" under the CWA. In contrast, Sparrows Point facility has twenty-two outfalls or "point sources" within the definition of 33 U.S.C. § 1362(14). As such, naming "Sparrows Point" as the location of the alleged violations, rather than specific outfalls, does not amount to identifying the "point sources" where the alleged violations occurred.[15]

Certainly, the requirement of adequate notice does not mandate that citizen-plaintiffs "list every specific aspect or detail of every alleged violation." *Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995). But it does mandate that citizen-plaintiffs "provide the alleged violator with enough information to attempt to correct the violation and avert the citizen suit." *Friends of the Earth, Inc.*, 629 F.3d at 400. I find that simply naming a facility as the location of the alleged violations does not comply with this mandate. *See id.* at 400–01 (finding that where alleged discharge violations were not specifically identified in the plaintiff's NOI letter, notice was inadequate and required reversal of the district court's finding that defendant had committed the violation); *Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 488 (2d Cir. 2001) (holding that a potential plaintiff's NOI letter in CWA case "must identify with reasonable specificity each pollutant that the defendant is alleged to have discharged unlawfully. Failure to do so will justify a district court's dismissing claims based on pollutants not properly noticed."). Here, Plaintiffs failed to identify

---

[15] Notably, the Complaint did name the outfalls where the violations are alleged to have occurred (*see* Compl. ¶¶ 111-112), but the NOI letter failed to do so.

the locations of the alleged violations with anything approaching reasonable specificity in the NOI letter. Accordingly, I grant Defendants' Motions to Dismiss Count VI.[16]

### B. Subject Matter Jurisdiction over Plaintiffs' Maryland State Law Claims

In Counts III, V, and VII, Plaintiffs allege violations of various Maryland environmental laws. Count III alleges violation of Title 7 of the Maryland Environmental Code (Hazardous Materials and Hazardous Substances) and implementing regulations, COMAR 26.13.01, *et seq.* (Compl. ¶ 95.) Count V alleges violation of Title 9 of the Environmental Code, Subtitle III (Water Pollution Control) and its implementing regulations, COMAR 26.08.01.01, *et seq.* (*Id.* ¶ 106.) Finally, Count VII alleges violation of Title 4 of the Environmental Code, Subtitle I (Sediment Control) and implementing regulations, COMAR 26.17.01.01, *et seq.* (*Id.* ¶¶ 115-120.) Defendants move this Court to dismiss all three Counts on the ground that none of these statutes or regulations authorize citizen enforcement. (Severstal Mem. 45.)

Defendants assert that with respect to Titles 7 and 9, the Maryland Department of Environment ("the Department") and the Attorney General are the sole entities that have enforcement authority. (*Id.* at 45-46.) The two titles have mirror enforcement provisions that provide:

> (a) Issuance of complaint. – The Department shall issue a written complaint if the Department has reasonable grounds to believe that the person to whom the complaint is directed has violated:
>   (1) This subtitle;
>   (2) Any rule or regulation adopted under this subtitle; or
>   (3) Any order, permit, or certificate issued by the Department under this

---

[16] In addition to incorporating Severstal's arguments for dismissal of Count VI, ArcelorMittal claims in its Motion to Dismiss that Plaintiffs cannot allege any continuing or intermittent violation of the Facility's NPDES permit by ArcelorMittal under Count VI because ArcelorMittal is not a permittee and does not discharge pollutants at or from the facility. (ArcelorMittal Mem. 16-18.) Because I dismiss Count VI for insufficient notice, I do not reach ArcelorMittal's independent claim for dismissal.

> subtitle.

Md. Code Ann., Envir. §§ 7-258 and 9-334.

> The Attorney General shall take charge of, prosecute, and defend on behalf of this State every case arising under the provisions of this subtitle, including the recovery of penalties.

Md. Code Ann., Envir. §§ 7-268 and 9-344. Accordingly, Defendants claim that "[n]o other governmental or non-governmental entities are authorized to enforce or bring suit to enforce the requirements of these two environmental statutes." (Severstal Mem. 46.)

Plaintiffs dispute Defendants' claims regarding Titles 7 and 9, stating instead that they "expressly preserve 'the right of any person' to enforce an action under these statutes." (Pls.' Opp'n 47.) In support, Plaintiffs cite Md. Code Ann., Envir. §§ 7-204 and 9-303, which provide:

> This subtitle does not take away the right of any person, as riparian owner or otherwise, in equity, at common law, or under statutory law to suppress a nuisance or abate pollution.

Plaintiffs claim that the language "any person" contained within these provisions enables them to bring suit as citizen enforcers. (*See* Pls.' Opp'n 47.) The function of §§ 7-204 and 9-303, however, is not to authorize citizen suits, but to make clear that Titles 7 and 9 do not preempt an individual's rights arising from another source. By their express terms, Titles 7 and 9 authorize the MDE and Attorney General only to seek relief for alleged violations of those Titles.[17] There is no authorization for citizen enforcement. Accordingly, I grant Defendants' Motions to Dismiss Counts III and V.

---

[17] *See, e.g.*, Md. Code Ann., Envir. § 7-263(a) ("*The Department* may bring an action for an injunction against any person who violates any provision of this subtitle or any rule, regulation, order, hauler certificate, vehicle certificate, or facility permit issued by the Department under this subtitle") (emphasis added); § 9-339(a) ("*The Department* may bring an action for an injunction against any person who violates any provision of this subtitle or any rule, regulation, order, or permit adopted or issued by the Department under this subtitle.") (emphasis added).

Finally, Defendants assert that while Title 4, Subtitle I authorizes a broader range of governmental entities to enforce the provisions of that Title and Subtitle than are authorized under Titles 7 and 9, only those expressly designated governmental entities may bring enforcement actions. Accordingly, Defendants move this Court to dismiss Count VII, which alleges a violation of Title 4, Subtitle I. (Severstal Mem. 47.)

The enforcement provisions of Title 4, Subtitle I provide:

§ 4-109 Complaints; orders; notices

(a) The Department may issue a written complaint if the Department has reasonable grounds to believe that the person to whom the complaint is directed has violated (1) this subtitle; (2) any rule or regulation adopted under this subtitle; or (3) any sediment control plan approved under this subtitle.

Md. Code Ann., Envir. § 4-109(a).

§ 4-116 Violations and penalties; injunctive relief; civil liability; enforcement.

(b) Injunctions. Any agency whose approval is required under this subtitle or *any interested person* may seek an injunction against any person who violates or threatens to violate any provision of this subtitle.
(c) Civil penalties. (1) In addition to any other sanction under this subtitle, the appropriate State, county, or municipal agency may bring a civil action against a person for a violation of this subtitle. . . .
(d) Enforcement by Attorney General. If a county or municipality fails to enforce any provision of this subtitle, the Department may request the Attorney General to take appropriate legal action to correct the violation and to recover penalties or fees under this section.

Md. Code Ann., Envir. § 4-116(b-d) (emphasis added). Defendants claim that based on these provisions of Title 4, the Department of Environment, the State itself, counties, municipalities, and the Attorney General are the sole entities authorized to enforce the Title. (*See* Severstal Mem. 47.) Of course, § 4-116(b) provides that "[a]ny agency whose approval is required under this subtitle or *any interested person* may seek an injunction . . ." Md. Code Ann., Envir. § 4-116(b). Defendants dismiss this language by stating that "any interested person" means only specified governmental entities in accordance with the definitions section of Title 4 (Severstal

Mem. 47 n.28) because the definitions section of Title 4 provides that "'Person' *includes* the federal government, the State, any county, municipal corporation, or other political subdivision of the State, or any of their units." Md. Code Ann., Envir. § 4-101.1(b) (emphasis added).

The fallacy in Defendant's argument is Article I of Maryland's Environmental Code provides that "unless the context requires otherwise, includes or including [means] by way of illustration and not by way of limitation." Md. Code Ann., Rules of Interpretation, Art. 1, § 30. Moreover, "person" is defined, for purposes of the Environmental Article, to mean "an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind to any partnership, firm, association, corporation, or other entity." Md. Code Ann., Envir., § 1-101(h). Against the background of this definition, it seems clear that the language of § 4-101.1 is merely intended to make clear that various governmental agencies are included in the phrase "other entity" as defined by § 1-101(h).

A separate order is being entered herewith.

July 5, 2011                                    /s/
Date                                    J. Frederick Motz
                                    United States District Judge